## West Estate

*Murray J. Jordan* and *F. J. Jordan*, for H. K. Brooks.

*Robert A. Rundle* and *George I. Minch*, for G. Gunston.

*John V. Snee,* for residuary legatees.

*Charles W. Herald,* for Commonwealth of Pennsylvania.

RAHAUSER, J., July 31, 1956.—Testatrix, Lucy F. West, died December 15, 1954, a resident of the City of Pittsburgh. Her last will and testament dated September 19, 1951, was duly probated and Harold K. Brooks, Esq., the named executor, was granted letters testamentary.

The inventory shows personal property in the home of decedent was appraised at $870 and that the real estate, cash in bank and securities were valued at approximately $288,000.

The petition for distribution submitted at the audit contains a receipt from Gordon Gunston as follows:

"In the Orphans' Court of Allegheny County, Pennsylvania. In re Estate of Lucy F. West, Deceased. No. 5313 of 1914.

*"Receipt for Legacy*

"I, Gordon Gunston, of Fort Collins, Colorado, hereby acknowledge receipt from the Estate of Lucy F. West, Deceased, of the Chinese Rug bequeathed to me in paragraph Third of the Last Will and Testament of said decedent, and the sum or value of $152.50 for the 'stuff in the house' of the decedent not otherwise given away by her, as bequeathed to me in the Codicil to her Last Will and Testament, valued and appraised in the Inventory and Appraisement of the Estate as follows:

"Chinese Oriental Rug . . . . . . . . . . . . . . . . . . . . $75.00
"Stuff in House not Otherwise Given Away . . 152.50

"Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$227.50

"Witness my hand, this 7th day of May, 1955.

"Witnesses:
"Elizabeth Phillips        Gordon Gunston
"Charles D. Phillips      (Gordon Gunston)"

When the estate came up for audit one of the questions presented pertained to a paper dated December 1, 1952, which provided as follows:

"I Lucy F. West do hear write that at my death, To Those who know Fred J. Jorden and Bettie Louis best of all, Want to leave To my Chauffeur Joseph L. Glomb the price of Three Thousand Dollars for all his kindness to me, and the stuff in the house that I havent given away to be sold and the money given to Gordon my nephew and I want it carried out as I have said.

Lucy F. West"

The nephew, Gordon Gunston, of Fort Collins, Colorado, now contends that the word "stuff" includes not only the tangible property in the house but the stocks and bonds that were located in a trunk in the home of decedent. A hearing was requested for the development of this contention and the court set May 16, 1956, for the hearing date on this matter as well as all other matters pertaining to the estate of decedent. At the hearing it was established that decedent had one safe deposit box at the Farmers National Bank, Pittsburgh, where she had 1,680 shares of Jones & Laughlin stock at the date of her death. The other securities that she owned at the time of her death, valued in excess at $100,000, were kept in a trunk in her home at 6644 Kinsman Road, Pittsburgh.

One of the chief witnesses for Gordon Gunston was Joseph L. Glomb, who was employed by decedent during the latter years of her life in the capacity of chauffeur. Over the objection of counsel for the residuary legatees he was permitted to testify that during 1953 he accompanied decedent to her bank and helped her to remove certain securities from her safe deposit box. He testified that she took them to her home and placed them in her trunk and that subsequently he had occasion to open the trunk at her request. Concerning this subject he testified as follows:

"Q. Did you ever have occasion to open the trunk at her request?

"A. Yes.

"Q. How would that request come about?

"A. She would call me and tell me to get the keys, and I would go to the trunk and get these envelopes and hand them to her.

"Q. What language would she use in referring to what was in the trunk?

"A. Stuff."

He further testified over objections of counsel as follows:

"Q. You said you went to the trunk many times to get these things from the trunk. Will you state as fairly as you can remember, just the words that would be used by Mrs. West when she asked you to get these papers?

"A. She would ask me, as she always said: 'Get the keys and get that stuff out of the trunk.'

"Q. Did she say that more than once?

"A. I imagine I opened that trunk more than 25 times. I never heard her use the word 'bonds' or 'stock'. She always used the word ' Stuff'."

Mr. Glomb also testified that decedent, Mrs. West, thought very well of Gordon Gunston and that decedent, in discussing with him what was to happen to the things in the trunk in the event of her death, said they were all to go to Mr. Gunston.

"Q. Did she ever discuss with you as to what was to happen to any of those things in the trunk when she died? . . .

"A. They were all to go to Mr. Gunston.

"Q. When did she tell you that?

"A. She told me that, I would say, about 15 times."

He further testified as to the decedent's will as follows:

"Q. How do you know that?

"A. She told me she had a will in this drawer where she kept it.

"Q. Did she give you any instructions as to that will?

"A. She said if anything would happen to her, I was to give the keys and the will to Mr. Gunston.

"Q. What keys?

"A. The keys of the trunk."

Mrs. Anna L. Anderson, who was employed by decedent from 1912 until her death, doing general housework, washing, ironing and cleaning, and taking care of decedent generally, testified concerning the trunk as follows:

"Q. And after you entered Mrs. West's employment in 1952, did she ever mention or call attention to a trunk and its contents?

"A. She did.

"Q. What did she say about it? If anything—

"A. If a fire would happen, to see that it got out; that there were stocks and bonds in there; that there were some valuable things in it, and to keep a good watch on it.

"Q. Did she tell you that these stocks and bonds and things had been there for any length of time?

"A. No; she did not tell how long.

"Q. Did she give you any further instructions about the contents of the trunk?

"A. Only if a fire occurred, for me to see that it was taken care of. She said these things are to be sold: the things in that trunk to be sold and given to Gordon. I can't say Mr. Gunston, because she called him Gordon all the time.

"Q. Did she ever talk to you about him?

"A. She was very fond of him. Her whole talk was about her nephew, because he was nice and kind to her.

"Q. When she mentioned about things in the trunk, about which you testified, what would her words be? Do you remember what she said?

"Mr. Snee: That is objected to, if the Court please.

"The Court: The witness may testify. I will rule on your motion at a later date.

"A. She said they think I'm lousy rich, but all of that stuff is to be sold and the money given to Gordon.

"Mr. Snee: I move that the answer be stricken as not responsive, if the Court please.

"The Court: Your motion will be overruled.

"Q. Did she make that statement more than once?

"A. Yes, she did.

"Q. Did she ever make any statement as to whether she had any will or paper of that kind?

"A. She told me she had a will.

"Q. Did she tell you where it was?

"A. In the chiffonier in her bedroom.

"Q. Did she give you any instructions as to what was to happen to that paper?

"A. No; she said Pat had the key and Mrs. Lewis was to take care of everything."

Another witness was Caroline Lehocky who was employed by decedent for some 23 or 24 years. She testified as to Gordon Gunston as follows:

"Q. When you were in the employment of Mrs. West, did she ever speak to you about her nephew, Gordon Gunston?

"A. Yes.

"Q. What did she say about him?

"A. She told me how she liked him. She said she left him my carpet and my dining-room furniture. She said, 'He gets plenty after I die.'

"Q. Did she say whether or not she liked Gordon?

"A. Oh, she liked him.

"Q. How did she say she felt about him?

"A. She liked him best in the family, and Mrs. Gunston too.

"Q. Mrs. Lehocky, I was asking you about Mrs. West and Gordon, and I would like you to state, as well as you can, as well as you can remember it, what Mrs. West said about Gordon or Mrs. Gunston, what all did she say?

"A. That's all that she said: That he was to get the carpet, and after I die, he get plenty. She liked him best in the family, she said."

Exceptant also offered in evidence a letter from Mrs. West to Mrs. Gunston, the pertinent content of which is as follows:

"Feb. 18

"Dear Folks:

"Well it sure is like spring everything up in the rock garden, so hope it dosnt freeze them. But nights are cool and frosty so that might keep them back some. You sure have had a winter, and looks like no end to it, see in this morning paper you had another storm. Went yesterday to make my will, so spent all afternoon with the lawyer Fred dosn't make it any more, but he does with me just the same, as he still is my lawyer. And hope this is my last will I make. But I wanted to give away things to those that are nice to me and real friends, not so bad, just for my money and the lawyers said I look younger then when Jim went. I was going to have this lawyer Brooks come out to the house, and draw it up, have known him as long as Fred. So he isn't any stranger and then get Caldwells to witness it. But old stick in the mud rather have the two lawyers that, appraised all my stuff, do it so I pleased him, said it would look better in peoples eyes after I go And am glad it done now if I am found gone I know what went with my things ha ha Well just got a birthday card from the fool in

N. J. saying darling sister. Again ha ha. Have quite a few pretty things from those that love me a nice card from Tish says her husband not any better as dropsey now. So I dont think he will last to long. Nancy didn't. Was kind of tired when got home, but feel pretty good this morning  Caroline brought me a big box of cookeys and a pretty piece she crochet for the telepone stand. She sure is a fine person. Says she feels a little better. and she look lot better  Miss Hoops sent me a fine box of candy and a rum puding. Going to town this afternoon find a brown coat if I can can't wear my fur any longer  to darn hot, And my black one is a little to old geting brown so am waiting for Bettie she is going with me  Then we might see a picture show and stay down for dinner, maybe Mamie wanted me to get a blue coat but think rather have a tan ore brown. The grass is ready to cut Tony said but I wont let him cut it yet. so pretty green. And the bird sure is a singer, keeps up with C. runing the Hover. Hope your toe is better G. My feet are fine since I went and had them fixed. Well I have to fix my checks to take in, so better get to it Also write a check for Fred to fill in on my Income tax I put the name on it and he does the rest. Well we just got home didn't get a coat. But went to show and had a nice dinner, and just got home and they have just left, 10. he works on Sat. so likes to go to bed at eleven. Heaps of love to all

Lucy"

These are substantially the facts that exceptant relies upon to establish that he is entitled to the stock and bonds in the trunk at the home of decedent. The court is of the opinion that this evidence was properly received in order to place the court in the armchair of testatrix: Jackson's Estate, 337 Pa. 561.

Exceptant contends that this evidence establishes that these securities are included in the words "stuff

in the house" contained in the codicil. The court is of the opinion that this evidence is not sufficient to support this contention.

From the testimony it can be inferred that the securities were in the house at the time the codicil was drawn. However, there is nothing in the testimony to show convincingly that the securities were intended to be included in or disposed of by the codicil.

The codicil appears to have been written primarily to make a bequest to Joseph L. Glomb. Testatrix prefaces this gift with the explanation that Fred J. Jordan and Betty Lewis knew best of all his kindness to her and in return for that she wanted him to have $3,000.

The remainder of the codicil provides that "the stuff in the house that I haven't given away . . ." is to be sold and the money given to Gordon Gunston.

The evidence shows that decedent did use the word "stuff" in referring to her securities. However, there is no convincing evidence that such was the use of the word in the paper before the court.

The presumption is that expressions are used in their ordinary and normal signification unless there is some clear indication to the contrary: Hogg's Estate, 329 Pa. 163. Here the evidence submitted is not sufficient to overcome the presumption of the law.

The well-established rule requires the usual and ordinary meaning to be given to words and terms in a will unless the context shows that such was not the meaning intended by testator. As Mr. Justice Mestrezat pointed out in construing the word "then" in the case of Wood v. Schoen, 216 Pa. 425, at page 430:

". . . The word 'then' is used twice in this collocation of words and for both purposes. In the first connection, it is manifestly used as a conjunction, meaning 'in that event', and in the second as an adverb of time, meaning 'at that time'. Inserting the definition

for the word itself the clause will read as follows: 'Upon the death of my said wife and all of my first named three sisters . . . in that event to those who would at that time be entitled thereto under the intestate laws of this state.' A universal rule in construing a will requires that if possible effect be given to every word and every part of it; and an equally well-established rule requires the usual and ordinary meaning to be given to words and terms in a will, unless the context shows that such was not the meaning intended by the testator."

Webster's Dictionary definition of "stuff" includes "Goods; personal property; . . . domestic goods, or baggage."

From the reading of the paper the court is of the opinion that decedent had in mind the furniture, carpets and household equipment that she had not given away, were to be sold and the proceeds given to her nephew, Gordon Gunston, and that this was done and a proper receipt for the same executed.

In view of the fact that testatrix had a formally drawn will, prepared by her attorney, which disposed of her entire estate, it does not appear likely that she intended to radically change her will and dispose of securities inventoried at $110,922.43 in such an informal codicil as the one we are presently asked to construe. It seems much more probable that she wanted to be sure that she had effectively disposed of all the articles in the house and, since she had only specifically referred to a few of such items in her formal will, i.e., a Chinese rug, some pictures, a clock, candlesticks, silverware, wearing apparel, furniture, etc., she attempted to cover the disposition of any other such items not previously disposed of by the latter part of the codicil in question. The direction to sell such items and give the proceeds to Gordon Gun-

ston was logical in view of the fact that Mr. Gunston lived in Colorado while the "stuff" given to him was in Pittsburgh, so that it might be impractical to give him the items in kind.

Testatrix was a woman of limited education as the codicil in dispute and her letter of February 18, 1949, to Mrs. Gunston disclose. In the letter of February 18 she indicated that she had just made her will and hoped that it was her last one. Then she said: "But I wanted *to give away things* to thoes that are nice to me and real friends, not so bad, just for my money. . . ." (Italics supplied.) The letter indicates that testatrix though of her will as "giving away" things. The codicil in question contains the expression: ". . . the stuff in the house *that I haven't given away*. . . ." (Italics supplied.) This expression may relate to items not given away by testatrix in her lifetime or it may relate to items which she may have thought she had not given away by her formal will.

What testatrix intended by the latter part of the codicil in question is not clear; she may have been referring to items of household goods of little value, not worth the cost of shipping them to Mr. Gunston, or she may have been referring to such items together with everything else in the house not otherwise disposed of. Language so uncertain in its application and so vaguely setting forth the intention of testatrix as that set forth in the latter part of the codicil should not be construed to radically alter the clear disposition of the estate as provided for in the formal will. Under the formal will Mr. Gunston would have received a one-third interest in the net proceeds of decedent's securities; under the codicil as interpreted by Mr. Gunston he would receive the entire proceeds of the securities to the exclusion of the other two residuary legatees. To effect such a change in the disposition of

a decedent's estate the language of a codicil should be clear and compelling.

In Rainear's Estate (1931), 304 Pa. 539, 543, the court said:

"It is a well established rule of testamentary interpretation that a will and codicil must be construed together and that a codicil shall disturb the dispositions of the original will only where its provisions are plainly inconsistent with the will: Vernier's Est., 282 Pa. 194, 198; Warne's Est., 302 Pa. 386, 394. If, however, the codicil is subject to two interpretations, one of which follows the main purpose as expressed in the will and the other is not consistent with it, the consistent interpretation will be adopted, because, generally speaking, there is no presumption that a codicil is intended to change a will: Bissell's Est., 302 Pa. 27, 32. 'The clearly expressed purpose of a testator is not to be overborne by modifying directions that are ambiguous and equivocal, and may justify either of two opposite interpretations. Such directions are to be so construed as to support the testator's distinctly announced main intention. . . . It is a sound rule of construction that "A codicil should not be held to interfere with any of the specific provisions of a will, unless its language naturally and obviously produce such result, or the terms of the codicil expressly recognize the alteration" ': Baugh's Est., 288 Pa. 308, 311, and cases there cited."

As was said in Conner's Estate, 346 Pa. 271, at page 273:

"While this is a layman's will in the handwriting of testatrix, and it is proper to explore the four corners of the will in the light of the circumstances under which it was written to discover her testamentary intent, we must keep in mind that it is not the province of the court 'to consider what the testator possibly intended, but only what intention is expressed in the

language used': Joyce's Est., 273 Pa. 404, 407, 117 A. 90; Biles v. Biles, 281 Pa. 565, 568, 127 A. 235."

In the present case Mrs. West failed to set forth her intention in the codicil with sufficient clarity to change the terms of the will in such a way as to give Gordon Gunston all the proceeds of the stocks and bonds in her house at the time of her death, rather than one-third of such proceeds. After studying the will and the codicil in the light of the testimony, the court is of the opinion that testatrix probably did not intend the words "stuff in the house" as used in the codicil to refer to her stocks and bonds. In any event the said expression in the codicil is so ambiguous and equivocal that it should be interpreted as consistently as possible with the original will as was done by the executor and by Mr. Gunston at the time he signed the receipt for his share of the estate: Rainear's Estate, supra; Boyer Estate, 372 Pa. 553, 556. Under the said interpretation Mr. Gunston was entitled only to $152.50, being the proceeds of the stuff in the house of testatrix not otherwise given away.

A decree will be drawn in accordance with this opinion.